IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM. NO. 08-00294 SOM (2) |
| | ) | CIV. NO 09-00559 SOM/KSC |
| Plaintiff- | ) | |
| Respondent, | ) | ORDER DENYING MOTION TO |
| | ) | VACATE, SET ASIDE, OR CORRECT |
| vs. | ) | A SENTENCE BY A PERSON IN |
| | ) | FEDERAL CUSTODY UNDER 28 |
| ROMELIUS RAMIRO, | ) | U.S.C. § 2255; ORDER DENYING |
| | ) | CERTIFICATE OF APPEALABILITY |
| Defendant- | ) | |
| Respondent. | ) | |
| _____ | ) | |

**ORDER DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE
BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. § 2255;
ORDER DENYING CERTIFICATE OF APPEALABILITY**

I.       INTRODUCTION.

          This case is before this court on remand from the Ninth

Circuit.  The Ninth Circuit reversed this court's denial of

Romelius Ramiro's motion for relief under 28 U.S.C. § 2255,

directing this court to conduct proceedings into whether Ramiro

would have gone to trial instead of pleading guilty to a drug

crime had he known the immigration consequences of his plea.

          Because Ramiro is not credible in his contending that,

had he been properly informed of the immigration consequences of

his guilty plea, he would not have pled guilty and would instead

have gone to trial, the court finds no factual basis for his

claims that his counsel's alleged ineffective assistance of

counsel has prejudiced him.  Ramiro is not entitled to relief

under § 2255.

## II.        FINDINGS OF FACT.

By way of background, this court states that Ramiro pled guilty pursuant to a plea agreement to having distributed approximately 0.067 grams of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, within 1,000 feet of the Honolulu Community College.  <u>See</u> ECF Nos. 132 and 168 (transcript).

On August 17, 2009, the court sentenced Ramiro to 12 months and 1 day in prison, 6 years of supervised release, and a $100 special assessment.  <u>See</u> ECF Nos. 159 and 164 (transcript). Judgment was entered on August 24, 2009.  <u>See</u> ECF No. 162. Ramiro did not appeal the conviction or judgment.

On November 24, 2009, Ramiro moved to vacate and set aside his conviction and sentence under 28 U.S.C. § 2255, arguing that he had not understood the immigration consequences of pleading guilty or of being convicted because his counsel had told him only that he might be deported and would be released after serving his sentence, when in reality his deportation was mandatory and he would be detained pending deportation.  <u>See</u> ECF No. 171.

On December 1, 2009, this court denied the § 2255 motion without holding an evidentiary hearing.  <u>See</u> ECF No. 175. The Ninth Circuit reversed and remanded the matter for an inquiry

into whether Ramiro's attorney had "effectively misled" Ramiro about the immigration consequences of his guilty plea and into whether Ramiro had been prejudiced by that misleading advice. <u>See</u> ECF No. 22.

This court now makes the following findings of fact:

1.    On May 15, 2014, this court heard testimony from Jeffrey Arakaki, the attorney who had represented Ramiro when he pled guilty and when he was sentenced, and Edmund Calaycay, Jr., Ramiros's interpreter.  <u>See</u> ECF Nos. 279 and 281 (transcript).  A continued hearing was held on July 24, 2014.[1]  <u>See</u> ECF No. 284. Ramiro submitted declarations in support of his § 2255 motion, ECF Nos. 179-2 and 284-1, but did not testify in person.  At the hearing on July 24, 2014, the court expressed concern about whether Ramiro could prevail without subjecting himself to cross-examination, but the parties agreed that the court could make determinations about Ramiro's credibility based on the existing record.  <u>See</u> ECF Nos. 279 and 281.

2.    At the hearing on May 15, 2014, Arakaki and Calaycay submitted declarations, which they said represented their direct testimony and which the court treated as such.  <u>See</u> ECF Nos. 276-1 and 276-2.  Both witnesses were then cross-examined in open court.

---

[1] The court does not have a certified transcript of this hearing, but has had access to a "rough," uncertified version of it to aid the court in preparing this order.

3

3.  Arakaki was credible.  During his testimony, he recounted what he had told Ramiro about the immigration consequences of pleading guilty.  Arakaki made no attempt to hide or stretch facts.  He gave the court the impression that he was being completely truthful.

4.  Calaycay's testimony was also credible.  Although his statements sometimes required clarification, his demeanor indicated that he was making every effort to be truthful and complete with respect to everything he testified about.  Ramiro's § 2255 motion had not called into question any conduct or interpretation by Calaycay, and the court discerned no stake on Calaycay's part in the outcome of this motion.  The court therefore gives credence to Calaycay's version of the facts, which supported Arakaki's version and contradicted Ramiro's version.

5.  Arakaki was appointed by the court to be Ramiro's attorney in this case.  ECF No. 276-1, ¶ 2, PageID # 880.

6.  Arakaki first met Ramiro at his arraignment and plea on May 20, 2008.  Id. ¶ 2, PageID # 881.  Arakaki spoke with Ramiro in English and without the aid of an interpreter, finding Ramiro's English language ability to be "quite good."  Id. ¶ 4, PageID # 881.  Calacay also viewed Ramiro as having had a "good understanding of the English language."  Decl. of Edmund Calacay, Jr., ¶¶ 1, 5, PageID # 897-98 (also stating that he observed

Ramiro talking with Arakaki in English on several occasions and that they appeared to be communicating effectively with each other).

7.  Arakaki received pretrial discovery from the Government in this case that indicated:

a.  On December 4, 2007, an undercover officer purchased methamphetamine from co-Defendant Ponciano Gamueda while Ramiro was in the "immediate vicinity."  Ramiro's role in the transaction was to remove a pouch from his pocket when he apparently heard the undercover officer ask to buy methamphetamine.  Ramiro tossed the pouch towards co-Defendant Adrina Barrett, who picked it up after it hit the ground. Barrett then went to Gamueda, who handed Barrett the $30 that the officer had given Gamueda for the drugs, then handed the officer the methamphetamine.

b.  On January 31, 2008, the undercover officer sought to purchase $20 of methamphetamine from co-Defendant Emmanuel Ibara.  Ramiro, who was again standing nearby, removed a packet of methamphetamine from his pocket and tossed it to Ibara, who then gave it to the undercover officer.  See Arakaki Decl., Second ¶ 4, PageID # 882-83.

8.  Arakaki says he showed the discovery, which was written in English, to Ramiro, who did not appear to have trouble understanding it.  Id. ¶ 5, PageID # 883.

9.  Arakaki says that Ramiro told him that he knew all of his co-Defendants and that he had been involved with them in selling methamphetamine from late 2007 to early 2008, the period relevant to the charges in the Indictment.  Ramiro told Arakaki that he himself used methamphetamine and sold it to support his drug habit.  Ramiro told Arakaki that what was alleged in the Indictment could indeed have occurred.  Id. ¶ 6, PageID # 884.

10.  Ramiro told Arakaki that Ramiro had never himself handed methamphetamine directly to a buyer.  Instead, he always handed it to one of his co-Defendants who would, in turn, hand it to the buyer.  Arakaki explained to Ramiro that this did not insulate him from criminal liability for drug crimes because of the concept of aiding and abetting.  Arakaki says that Ramiro seemed to understand the explanation.  Id. ¶ 7, PageID # 884.

11.  Given Ramiro's admission to Arakaki that Ramiro had indeed been selling methamphetamine, Arakaki said that he could not allow Ramiro to testify in his own defense at trial. Instead, their trial strategy was to put the Government to its burden, which Arakaki thought turned on whether Ramiro's co-Defendants would testify against him.  Id. ¶ 9, PageID # 885.  By early 2009, all of the co-Defendants had agreed to cooperate with the Government and testify against Ramiro.  Id. ¶ 11, PageID # 885.

12.   Arakaki says he then met with Ramiro on several occasions to discuss how the case would proceed.  Arakaki says that Ramiro agreed that, with all of the co-Defendants testifying against him, there was a high likelihood that a jury would convict him.  Id. ¶ 12, PageID # 886.

13.   The court agrees that, with his co-Defendants testifying against him, and absent evidence casting doubt on their testimony, Ramiro was highly likely to have been convicted of the crimes charged in the Indictment had he gone to trial. Ramiro's co-Defendants admitted the factual allegations contained in the Indictment.  That is, Gamueda, in his plea agreement, admitted that, on December 4, 2007, he, Barrett, and Ramiro had sold approximately 0.067 grams of a mixture or substance containing methamphetamine to an undercover officer for $30 within 1,000 feet of the Honolulu Community College (the charge in Count 1 of the Indictment).  After Gamueda agreed to sell the methamphetamine to the officer, Ramiro had tossed a packet containing the drugs towards Barrett, who picked the packet up off the ground and handed it to the undercover officer.  See Memorandum of Plea Agreement of Ponciano Gamueda, ECF No. 103, ¶ 8(a), PageID # 220.  Barrett, while pleading guilty to Count 1 of the Indictment without a plea agreement, admitted her role in the offense.  See ECF Nos. 61, 62.  In Ibara's plea agreement, he admitted that, on January 31, 2008, he and Ramiro had sold

approximately 0.069 grams of a mixture or substance containing methamphetamine to an undercover officer within 1,000 feet of the Honolulu Community College (the charge in Count 3 of the Indictment). See Memorandum of Plea Agreement of Emmanuel Ibara, ECF No. 108, ¶ 8(a), PageID # 236.

14. Arakaki recalls Ramiro's concern about minimizing prison time. Arakaki explained to Ramiro that the best prison sentence he could hope for was one year. There was a pending state-court criminal case against Ramiro, and Arakaki explained that there was a greater chance that the state court would issue a sentence that ran concurrently with the federal sentence than that the federal court would run its sentence concurrently with the state sentence. Accordingly, Arakaki told Ramiro it made sense for him to plead guilty in this court and be sentenced before being sentenced by the state court. Id. ¶¶ 12-13, PageID # 887-88.

15. Calaycay testified that he translated conversations between Arakaki and Ramiro in which Ramiro expressed concern about being deported. See ECF No. 281 at 25, PageID # 937. Arakaki also testified that Ramiro was concerned about deportation. See id. at 53, PageID # 965.

16. Arakaki was aware that an aggravated felony conviction would lead to Ramiro's removal from the country with few to no exceptions. Arakaki Decl. ¶ 14, PageID # 888. Arakaki

8

says that he told Ramiro on more than one occasion that, if he was convicted of either of the drug charges asserted in Counts and 3 of the Indictment, both of which involved aggravated felonies for purposes of immigration, immigration authorities would initiate deportation proceedings and that Ramiro would "more than likely" be deported to the Philippines. Id. ¶ 15, PageID # 889; ECF No. 281 at 54, 60, PageID #s 966, 972. Calaycay testified that he heard Arakaki tell Ramiro that he "more than likely" would be deported, and Calaycay interpreted this for Ramiro. See Id., PageID # 931. Arakaki told Ramiro that, upon completion of his prison sentence, he would also "very likely be detained" for deportation proceedings. See Arakaki Decl. ¶ 17, PageID # 890.

17. Arakaki testified before this court that, although the removal statute for aggravated felonies used mandatory language, he knew that deportation would not occur without a deportation ruling by an immigration judge, and that any such ruling could be appealed. Id. ¶ 16, PageID # 889-90. Arakaki appeared to this court to be saying that, notwithstanding the mandatory language in the statute, nothing involving an act by a human being could be viewed as absolutely guaranteed. Thus, Arakaki testified that he did not know whether an immigration judge might possibly rule that Ramiro would not be deported. See ECF No. 281 at 60, PageID # 972. Arakaki noted that, at

9

immigration seminars he had attended, he had been told that "in the end, [it's] up to the immigration judge." ECF No. 281 at 68, PageID # 980.

18. Ramiro entered into a plea agreement with the Government in which he agreed to plead guilty to Count 1 of the Indictment, and the Government agreed to dismiss Count 3 of the Indictment after sentencing. See ECF No. 135 (Memorandum of Plea Agreement). In paragraph 8 of the plea agreement, Ramiro admitted to having participated in the sale of methamphetamine on December 4, 2007, within 1,000 feet of Honolulu Community College. Id., PageID # 279. Specifically, Ramiro agreed that an undercover officer had asked co-Defendant Gamueda for a "twenty," which Gamueda told him would cost $30. Ramiro agreed that, after the officer handed the money to Gamueda, Ramiro reached into his pocket, removed a pouch containing methamphetamine, and tossed it to co-Defendant Barrett. Ramiro further agreed that Barrett then picked the pouch up from the ground and gave it to Gamueda, who gave it to the undercover officer. Id., PageID #s 279-80.

19. Arakaki says that, before Ramiro's change of plea hearing, he had Calaycay translate the plea agreement for Ramiro into Ilocano. Id. ¶ 18, PageID # 891; Calaycay Decl. ¶¶ 1, 5, 6 PageID # 897-99. Ramiro indicated that he understood the plea agreement. Arakaki Decl. ¶ 18, PageID # 891.

20.  On April 30, 2009, Ramiro changed his plea from not guilty to guilty before then-Magistrate Judge Leslie E. Kobayashi.  See ECF No. 132.  The Magistrate Judge asked Ramiro whether the facts set forth in the plea agreement were true. Ramiro said that they were and explained that, on December 4, 2007, within 1000 feet of a school, he had sold 0.067 grams of a substance or mixture containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers to an undercover agent in Hawaii.  See Transcript of Proceeding, ECF No. 168, PageID #s 418-19.  Calaycay says that he never heard Ramiro profess to be innocent of the charges.  Calaycay Decl. ¶ 8, PageID # 900.

21.  At the change of plea hearing, the Magistrate Judge told Ramiro that, because he was not a citizen, his guilty plea might affect his right to remain in the country.  Ramiro indicated that he understood this.  ECF No. 168, PageID # 413. Arakaki then stated, "Your Honor, for the record, I have advised my client that he more than likely will be deported upon completion of a sentence of incarceration."  Id., PageID # 414.

22.  This court adopted the Magistrate Judge's recommendation that Ramiro's guilty plea be accepted.  See ECF No. 137.

23.  According to paragraph 18 of the Presentence Investigation Report, the original copy of which is located in

11

the court's Probation Office, Ramiro was interviewed by the court's Probation Officer on May 8, 2009. Calaycay was present during that interview. Ramiro told the Probation Officer that he accepted responsibility for committing the offense charged in Count 1 of the Indictment and expressed remorse for his actions.

24. On August 17, 2009, the court sentenced Ramiro to 12 months and 1 day in prison, 6 years of supervised release, and a special assessment of $100. See ECF No. 159. At his sentencing hearing, this judge spoke to Ramiro in English and Ramiro answered questions in English. He read his allocution in English. See ECF No. 164, PageID #s 383, 387-88, 392-93 (transcript of sentencing proceeding). This court's first-hand observation of Ramiro at the sentencing hearing led this judge to conclude that he understood English and was capable of communicating in English.

25. During the sentencing proceeding, there was a discussion of whether, for immigration purposes, Ramiro would be better off with a sentence of one year or one year and one day. The court explained to Ramiro that, if he was sentenced to more than one year, he would be eligible to get out of prison earlier based on good behavior. See ECF No. 164, PageID # 387. But the court told Ramiro that he "wouldn't actually be out because once you finish your prison term, again immigration would step in and an immigration decision would be made." Id. The Probation

12

Officer explained that Immigrations and Custom Enforcement "has a zero tolerance policy on drug distribution offenses.  If the offense of conviction specifically identifies methamphetamine . . . , then their zero tolerance policy dictates that, regardless of the nature or length of sentence imposed, deportation cannot be circumvented."  Id., PageId 391.  Calaycay testified that he translated "zero tolerance" for Ramiro.  See ECF No. 281 at 27-28, PageID # 939-40.  Ramiro did not ask to withdraw his guilty plea upon hearing that he would be deported after he completed his sentence.  See Arakaki Decl. ¶ 21, PageID # 894.

    26.  Unlike Arakaki and Calaycay, Ramiro did not present himself for live testimony during proceedings on his § 2255 motion.  While his appeal in this § 2255 action was pending, Ramiro had sought an order preventing his deportation.  The Ninth Circuit ruled that he could be deported, and he was therefore removed to the Philippines, where he remains.  Apart from the expense of traveling to Hawaii, Ramiro expressed concern that, if he set foot in the United States, he might be detained.  The Assistant United States Attorney reported to the court that Ramiro would be able to return to the United States for a short period of time to participate in a court hearing such as a § 2255 hearing.  The AUSA stated that, during that time, he would be on parole status and not in custody.  See ECF No. 268.  Nevertheless expressing concern about the possibility that he would be

arrested and held, Ramiro did not appear in person for § 2255
proceedings.  The attorneys in this case informed this court of
their understanding that Philippine law prohibited Ramiro, while
in the Philippines, from testifying before this court by phone or
video.  While the court is not unsympathetic to Ramiro's concern,
Ramiro's ability to overcome the credible testimony by Arakaki
and Calaycay is obviously affected by his reliance solely on
written evidence.

        27.  The court finds that Ramiro's version of the facts
underlying his § 2255 motion, as set forth in his declarations,
ECF Nos. 179-2 and 284-1, is not credible.  There are numerous
inconsistencies between what Ramiro says happened and the court's
observations and the credible evidence in this case:

        a.  Ramiro says that he "can hardly speak
English.  I need a translator to communicate with a non-Ilocano."
Decl. of Romelius Ramiro ¶ 10, PageID # 491.  Both Arakaki and
Calaycay credibly testified that Ramiro communicated with Arakaki
in English.  The court's own observation at Ramiro's sentencing
hearing (confirmed by his conduct during the hearing of May 15,
2014) was that Ramiro could understand and speak English, as
Ramiro communicated with this judge in English and read the court
his allocution in English.  The court therefore does not credit
Ramiro's claim that he hardly speaks English.  Ramiro's lie on

this point affects the court's view of his credibility on other points.

b.    Ramiro says that he "threw away a packet which [his co-Defendants] said contained drugs because I was afraid to get involved." Supp. Ramiro Decl. ¶ 8, PageID # 1028; Ramiro Decl. ¶ 17 (same). This statement is at odds with the record before this court. Ramiro provides no explanation of why, if he was afraid to get involved, he was holding the drugs in the first place. Moreover, Ramiro's claim of innocence goes against his admission to his attorney that he was dealing drugs during the relevant period to support his own drug habit, and that he thought he was insulated from criminal liability by not having given methamphetamine directly to the buyers. It also goes against the factual agreement in his plea agreement, which Calaycay translated for him, and against his own words, given under penalty of perjury to the Magistrate Judge at his change of plea hearing, when he admitted to having sold drugs as alleged in Count 1 of the Indictment. It further goes against statements he made to the Probation Officer who prepared his Presentence Investigation Report; Ramiro accepted responsibility for his actions and expressed remorse for his actions. Moreover, when he was being sentenced by this judge, far from claiming innocence, Ramiro apologized for his actions. The court notes that his co-Defendants' plea agreements also indicate that Ramiro is guilty

of the Indictment's charges.  Therefore, the court views Ramiro's
present version of his actions as contradicted by the record.
While the issue of whether Ramiro did commit the drug crime is
certainly not, on its own, dispositive of what Arakaki told
Ramiro or of whether Ramiro would have gone to trial but for
Arakaki's statements, the court's concerns about Ramiro's
credibility as to the drug transaction spill over into the
court's evaluation of Ramiro's credibility concerning whether he
would have gone to trial.

         c.   Ramiro claims that, in discussing the
likelihood that he would be deported, Arakaki did not use the
words "more than likely," but instead told him that he "may be
deported."  This conflicts with the credible testimony provided
by Arakaki and Calaycay.  It also conflicts with the transcript
of Ramiro's change of plea proceeding, in which Arakaki clarified
for the record that, before the change of plea hearing, he told
Ramiro that he "more than likely" would be deported.  The
credible evidence before the court establishes that Ramiro was
told by Arakaki that, upon his conviction, he "more than likely"
would be deported.

         d.   Ramiro intimates that he did not know that,
if he went to trial, the Government would have had to prove his
guilt beyond a reasonable doubt.  <u>See</u> Supp. Ramiro Decl. ¶ 16
(complaining that Arakaki did not tell him of the Government's

burden).  But the Magistrate Judge told Ramiro at his change of
plea hearing: "At trial you would be presumed to be innocent and
the Government would have the burden of proving you guilty,
beyond a reasonable doubt."  ECF No. 168 at 15, PageID # 416.

e.    Ramiro says, "When my sentence was completed
on November 27, 2009, I expected to be released.  However,
immigration authorities came to the Federal Detention Center and
took me away."  Supp. Ramiro Decl. ¶ 24, PageID # 1031.  But at
his sentencing hearing, the Probation Officer told him that
Immigrations and Custom Enforcement had a "zero tolerance"
policy, which Calaycay translated as "everybody is deported."
See ECF No. 281 at 27, 28, PageID # 939, 940.  This judge also
told him at that hearing that he "wouldn't actually be out
because once you finish your prison term, again immigration would
step in and an immigration decision would be made."  ECF No. 164,
PageID # 387.  Moreover, his attorney credibly testified that he
told Ramiro that, upon completion of his sentence, he would "very
likely be detained" for deportation proceedings.  See Arakaki
Decl. ¶ 17, PageID # 890.

28.    Ramiro says that, had he been correctly told by
Arakaki that removal was mandatory, he would have insisted on
going to trial instead of changing his plea.  Supp. Ramiro Decl.
¶ 14, PageID # 1029; Ramiro Decl. ¶ 15, PageID # 492.  The court
does not find this statement credible.  The many inconsistencies

noted in the previous paragraphs and this judge's own observations of Ramiro as he spoke with this judge in English lead this court to question Ramiro's veracity, not just as to his ability to speak English but as to his account of what occurred. Arakaki credibly testified that Ramiro admitted to him that he had been dealing methamphetamine, meaning that Arakaki could not have put Ramiro on the stand during trial to present perjured testimony. The reality was that Ramiro knew that all his co-Defendants were prepared to testify against him, making it likely he would be convicted if he went to trial. Comparing his declarations with the credible evidence before this court, this court determines that Ramiro is now making statements for the sole purpose of supporting his § 2255 motion. Given that determination, the court gives no credence to his claims that, had he known that deportation was mandatory and that he would be detained after serving his sentence, he would not have pled guilty and would have instead insisted on going to trial.

## III.     CONCLUSIONS OF LAW.

1.     A federal prisoner may move to vacate, set aside, or correct his or her sentence if it "was imposed in violation of the Constitution or laws of the United States, . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255.

2.    Ramiro seeks relief under § 2255, arguing that his former counsel, Arakaki, was ineffective in advising him about the immigration consequences of his guilty plea and by telling him that, after he served his sentence, he would be released. The court concludes that Arakaki was not ineffective.  To establish ineffective assistance of counsel, Ramiro must show both that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  There is "a strong presumption" that counsel's conduct was reasonable and that counsel's representation did not fall below "an objective standard of reasonableness" under "prevailing professional norms."  <u>Id.</u> at 688.  Even if a petitioner can overcome the presumption of effectiveness, the petitioner must still demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction," judicial scrutiny of counsel's performance is highly deferential.  <u>Id.</u> at 689.

3.    In 2010, the Supreme Court of the United States stated, "The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation."  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 367 (2010).

The Court further stated, "when the deportation consequence is truly clear . . . , the duty to give correct advice is equally clear." Id. at 369. In Chaidez v. United States, 133 S. Ct. 1103 (2013), the Supreme Court clarified that its ruling in Padilla did not have retroactive effect with respect to defendants whose convictions became final prior to Padilla. See id. at 1105. Because Ramiro's judgment became final before Padilla, the court looks to the law in effect at the time of his judgment and conviction to determine whether his counsel's performance was deficient.

4.    At the time of his judgment and conviction, a criminal defense attorney's duty with respect to the immigration consequences of a guilty plea was governed by United States v. Kwan, 407 F.3d 1005 (9ᵗʰ Cir. 2005), abrogated by Padilla, 559 U.S. 356 (2010). Kwan held that an attorney had "effectively misled" the defendant about the immigration consequences of a guilty plea when the attorney did not merely fail to inform him of those consequences, but actually told him there was no serious possibility that his conviction would cause him to be deported. That "effectively misleading" advice satisfied the deficient performance prong of the ineffective assistance of counsel test. Id. at 1015-16.

5.    Arakaki's statement that Ramiro would "more than likely" be deported is a far cry from the "effectively

misleading" advice at issue in <u>Kwan</u>.  But even assuming Arakaki's legal advice was deficient, Ramiro is not entitled to § 2255 relief for ineffective assistance of counsel unless he was prejudiced by Arakaki's allegedly deficient performance.  <u>See</u> <u>Strickland</u>, 466 U.S. at 694.  Ramiro shows no such prejudice.

6.    Ramiro claims that he suffered prejudice because, had he been informed that he would be deported if he pled guilty, he would not have pled guilty and would have instead insisted on going to trial.  The only evidence Ramiro points to as establishing that he would have gone to trial are his after-the-fact declarations.  This court, as noted above, finds those declarations not credible.  Whether Ramiro might have appeared credible in live cross-examination is something the court can only speculate about.  What is not speculation is that Ramiro's declarations are contradicted by the credible testimony of Arakaki and Calaycay, as well as by the court's own in-court observations.

7.    The credible evidence indicates that Ramiro, knowing that his co-Defendants would testify against him, saw that it was highly unlikely that he would be acquitted.  He thus focused on getting the best sentence possible.  His guilty plea allowed him to have Count 3 dismissed and to have a lower total offense level (minus two points for acceptance of responsibility and minus one point for early acceptance of responsibility) than

21

he would have had if he went to trial and was convicted. Although Ramiro was indisputably concerned with the immigration consequences of his plea, he would have pled guilty even had he been told that his deportation was mandatory. This conclusion is consistent with Ramiro's lack of reaction to being told of immigration authorities' "zero tolerance" policy at his sentencing hearing. Having failed to show prejudice, Ramiro cannot sustain a claim of ineffective assistance of counsel based on having been told that he "more than likely" would be deported.

8. To the extent Ramiro asserts an ineffective assistance of counsel claim based on having been told that, upon completion of his sentence, he would be released, that claim also fails because Ramiro once again fails to show prejudice. Ramiro asserts, "When my sentence was completed on November 27, 2009, I expected to be released. However, immigration authorities came to the Federal Detention Center and took me away." Supp. Ramiro Decl. ¶ 24, PageID # 1031. Arakaki told the Magistrate Judge at the change of plea hearing that he had advised Ramiro that he would "very likely be detained" for deportation proceedings upon completion of his sentence. <u>See</u> Arakaki Decl. ¶ 17, PageID # 890. At his sentencing hearing, the Probation Officer told Ramiro that ICE had a "zero tolerance" policy, which Calaycay translated as "everybody is deported." <u>See</u> ECF No. 281 at 27, 28, PageID # 939, 940. This judge also told him at that hearing

that he "wouldn't actually be out because once you finish your prison term, again immigration would step in and an immigration decision would be made." ECF No. 164, PageID # 387. Ramiro's after-the-fact assertion that he expected to be released upon completion of his sentence is therefore hard to fathom.

9. The court concludes that, even if Ramiro could be said to have shown that Arakaki told him he would be released after serving his sentence, Ramiro's after-the-fact assertion, placed against the evidence that causes the court to find Ramiro not credible, is insufficient to show that, had Ramiro realized he would not be released after serving his sentence, he would not have pled guilty and would have instead insisted on going to trial.

**IV.    THE COURT DECLINES TO ISSUE A CERTIFICATE OF APPEALABILITY.**

The court declines to grant Ramiro a certificate of appealability. An appeal may not be taken to the court of appeals from a final order in a § 2255 proceeding "[u]nless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(B). The court shall issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a § 2255 petition on the merits, a petitioner, to satisfy the requirements of section 2253(c)(2), "must demonstrate that reasonable jurists would find

the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). When, however, a

> district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Id.

This court has determined that Ramiro is not credible in his assertions. Because no reasonable jurist would rely on incredible assertions, this court does not think any reasonable jurist would find this court's assessment of the merits of Ramiro's constitutional claims debatable or wrong. Accordingly, the court declines to issue a certificate of appealability.

**V.       CONCLUSION.**

Ramiro's § 2255 Petition is denied, and no certificate of appealability issues.

The Clerk of Court is directed to enter judgment in favor of the Government and against Ramiro pursuant to this order and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 27, 2014.



/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

United States of America v. Ramiro, Crim. No. 08-00294 SOM (02) and Civ. No. 09-00559 SOM/KSC; ORDER DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. § 2255; ORDER DENYING CERTIFICATE OF APPEALABILITY